UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/16/2020
```

-----------------------------------------------------------------------X
                                            :

LYNDA T STEWART,                          :

                   Plaintiff,        :

                                   :           18-cv-12297 (LJL)

        -v-                      :

                                   :         OPINION AND ORDER

FASHION INSTITUTE OF TECHNOLOGY,   :

                                   :

                  Defendant.      :

                                   :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

       Plaintiff Lynda T. Stewart ("Plaintiff" or "Stewart") brings this action under Title VII of

the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et seq.* ("Title VII"). The complaint

also brought claims under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C.

§ 794, *et seq.*, but those claims have been withdrawn. *See* Dkt. No. 45 at 1. Plaintiff alleges that

her employer, Fashion Institute of Technology of the State of New York ("Defendant" or "FIT"),

discriminated against her on the basis of her race and unlawfully retaliated against her when she

was not reappointed to the position of adjunct professor. Defendant moves for summary

judgment on all claims. For the reasons that follow, Defendant's motion is granted and the

claims are dismissed.

## BACKGROUND

       The following facts, set forth in Defendant's 56.1 statement and supported by specific

citations to admissible evidence and either assented to or responded to by Plaintiff with mere

boilerplate objections that do not contain citations to admissible evidence are taken as undisputed

for purposes of this motion. *See, e.g. Cruz v. Wyckoff Heights Med. Ctr.*, 2016 WL 4533568, at

*1 (S.D.N.Y. July 19, 2016) ("Because nearly all of the paragraphs in Pl.'s Response are

boilerplate responses that do not cite specific evidence, and because Pl.'s Statement does not independently cite to admissible evidence to the contrary, the following paragraphs from Defs.' Statement are deemed admitted . . .") (listing paragraphs).

### A.   The relevant parties

FIT is a college of art and design, business, and technology, which provides career education to over 10,000 students on its campus located in Manhattan, New York.  FIT is part of the State University of New York, which is a system of public institutions of higher education in the State of New York.  Dkt. No. 46 ¶ 1.  FIT is part of the Jay and Patty Baker School of Business and Technology, of which Steven Frumkin ("Frumkin") is Dean.  FIT has a Fashion Business Management Department ("FBM"), which offers a curriculum focusing on fashion marketing and merchandizing retail management, team development, and product development.  *Id*. ¶ 2.  The FBM chair generally oversees the operations of the FBM.  From 2000 to 2008, and from 2010 to present, Professor Robin Sackin-Litwinsky ("Sackin") was the FBM Chair.  *Id*. ¶ 4.

Plaintiff Lynda Stewart is an African-American woman who is a former FBM part-time adjunct professor.  Her employment with FIT was terminated effective on April 5, 2018.  *Id*. ¶ 6.

### B.   FIT reappointment and termination procedures

As a non-certificated adjunct professor, at all times during her employment at FIT, Plaintiff was subject to a reappointment process each semester, during which her performance was evaluated and a vote was conducted by eligible department faculty members as to whether she should be reappointed to her position for the following semester.  *Id*. ¶¶ 19, 25, 31, 38.  The reappointment process is governed in part by a collective bargaining agreement ("CBA") that dictates the terms and conditions of employment of adjunct and full-time professors.  *Id*. ¶ 5, 18; Dkt. No. 41-6 (CBA).

As part of the reappointment process for employees such as Plaintiff, a member of the permanent, full-time faculty observes a class taught by the reappointment candidate and prepares an observation summary on a Faculty Observation Form, including a point value in six performance categories. Dkt. No. 46 ¶¶ 19-20. Following the observation, the observer and the reappointment candidate meet to discuss the observation. *Id*. ¶ 21. The reappointment candidate may respond to the Faculty Observation Form in a formal written rebuttal that is submitted to the department chair. *Id*. Also as part of the reappointment process, student evaluations are taken at the conclusion of each course taught by the reappointment candidate. *Id*. ¶ 22. Both the student evaluations and the faculty observation are considered during the reappointment process. *Id*. ¶¶ 23-24. During the semester, a department meeting is scheduled with notice to members of the department, including the reappointment candidates. The Tenure and Promotion Committee ("T&P Committee") administers the reappointment meeting.

During the reappointment meeting, and as required by the CBA, the reappointment candidate's Faculty Observation Form is read to department faculty members in attendance. If the reappointment candidate has submitted a written rebuttal, the department chair reads the rebuttal during the reappointment meeting. The department faculty are permitted to question the candidate, if present, and the candidate is permitted to answer such questions. The candidate must leave the room after the questioning is completed, and then a discussion takes place among the present permanent faculty members. *Id*. ¶ 24. Once the candidate departs the reappointment meeting, a ballot is distributed to all eligible department faculty members in attendance, and a vote is conducted by secret ballot. The candidate is permitted to be present when the ballots are counted, but not during the voting process. *Id*. ¶ 25.

Pursuant to the CBA, unqualified approval of a candidate for reappointment requires a

2/3 majority vote, and approval with reservations or non-reappointment requires a simple

majority vote of the permanent department faculty members in attendance.  *Id.* ¶ 26; Dkt. No. 46

("Pierre Decl."), Ex. F at FIT 000124.  The results of the secret ballot vote are recorded on an

Adjunct Faculty Reappointment Recommendation Form.  Dkt. No. 46 ¶ 26; Pierre Decl., Ex. F at

FIT 000125.  The ballots of the department votes are destroyed following the reappointment

meeting.  Dkt. No. 46 ¶ 26; Dkt. No. 41-2 ("Gross Dep.") 16:8-16; CBA at FIT 000125.  If, in

the fall semester, the department decides that a candidate should not be reappointed for the

spring semester, he or she must be notified by December 1.  Dkt. No. 46 ¶ 26; CBA at FIT

000124.

After the reappointment meeting, the T&P Committee Chairperson drafts a

reappointment memorandum with the input of the other T&P Committee that summarizes

feedback and discussion from the department's permanent faculty members present at the

reappointment meeting as well as the reappointment candidate's Faculty Observation Form, any

rebuttal, and the relevant student evaluations.  Dkt. No. 46 ¶ 27.  Following the vote, the results

are reported to the Dean along with the reappointment candidate's Faculty Observation Form,

any rebuttal, and the relevant student evaluations.  *Id.* ¶ 28.

At all times relevant to Plaintiff's claims, the members of the FBM T&P Committee were

Professor Naomi Gross ("Gross"), who served as the committee Chairperson, Professor Nancy

Sheridan ("Sharidan"), Professor Robert Vassalotti ("Vassalotti"), Professor Laticha Brown

("Brown"), and Professor Mark Higden ("Higden").  *Id.* ¶ 29.

### C.     Plaintiff's employment at and termination from FIT

Plaintiff was hired by FIT as a part-time adjunct professor at FBM in the fall of 2000, and

held that position until 2008.  *Id.* ¶ 30.  In December 2012, after spending five years in an

unrelated job, Plaintiff contacted Sackin to apply for an open adjunct role for the spring 2013

semester, and she was once again hired for that position, which she held until spring 2018.  *Id.* ¶¶

6, 35-37.  For the semesters in which Plaintiff was an adjunct professor at FIT between fall 2000

through Fall 2016, she received consistent Faculty Observation ratings of "good," "very good,"

and "excellent," on a scale that contains "Poor," "Satisfactory," "Good," "Very Good," and

"Excellent."   Dkt. No. 25 ("Compl.") ¶ 13; Dkt. No. 46 ¶¶ 32-34, 39-42.

On February 15, 2017, Professor Todd Blumenthal ("Blumenthal") conducted Plaintiff's

faculty observation, and gave Plaintiff a rating of "Good."  Dkt. No. 46 ¶ 53.  Blumenthal made a

number of recommendations and suggestions in his observation, including that Plaintiff refer to

the Bruce Tuckman theory as "Tuckman's stages of group development" as opposed to "The

Tuckman" and that Plaintiff use available PowerPoint slides within FBM to provide additional

content to her students as opposed to referring to workbook materials.  Blumenthal also noted

that students were "drinking and eating in the classroom" and that students were "surfing" the

internet on their laptops during class.  Blumenthal additionally noted that Plaintiff experienced

"challenges in figuring out how to use the overhead projector and getting [her] video up and

running," and recommended that Plaintiff "arrive in the classroom beforehand" to "make sure all

the technology is up and running."  *Id.* ¶ 54; Pierre Decl., Ex. T.

On February 27, 2017, Plaintiff attended a post-observation meeting with Blumenthal.

Plaintiff testified that it is her belief that Blumenthal exhibited racial bias and discrimination in

this meeting, on the grounds that Blumenthal's observations were contradictory and that

Blumenthal had "insufficient knowledge for what he had to say."  Dkt. No. 41-1 ("Pl. Dep.")

86:14-87:3.  In particular, Blumenthal "referred to a video . . . which completely did not reflect

the comments that he made" and "thought he knew . . . more about the subject matter than

[Plainitff] did." *Id.* at 87:6-12.  Plaintiff also believed Blumenthal to be motivated by race

discrimination because his tone was condescending. *Id.* 89:14-20.

      Also on February 27, 2017, Plaintiff met with Sackin regarding her student evaluations

for the two classes she taught in the preceding fall 2016 semester.  The comments in her student

evaluations included statements by students that there was a "lack of effective teaching

methods," and a "lack of clarity in delivery and grading criteria" and that the students needed to

teach themselves the course material.  Dkt. No. 46 ¶ 48; Pierre Decl., Exs. R and S; Dkt. No. 39

("Gross Decl."), Ex. A.  For one of the classes Plaintiff taught, she received an overall score of

5.02 out of a possible score of 6.0.  She also received raw scores of under 5.00 for seven

performance categories, and her lowest rating was for using course time effectively at 4.35.  Dkt.

No. 46 ¶ 49.  For the other class Plaintiff taught, she received an overall score of 4.52 out of a

possible 6.0, received raw scores under 5.00 for thirteen performance categories, and received a

rating of 4.00 for four performance categories, including using course time effectively, using

helpful materials, presenting materials in a clear manner, and being aware of whether students

understood course materials.  *Id.* ¶ 50.  FIT considers evaluation scores of under 4.0 in any

performance category or as an overall basis to be reflective of poor performance. *Id.* ¶ 51.

      In a rebuttal to the student evaluations that Plaintiff sent by email to Sackin dated March

8, 2017, Plaintiff stated that she was "very disappointed and blindsided" by the Fall 2016 student

evaluations, and stated that they were "not typical of my prior student evaluations."  Pierre Decl.,

Ex. U.  Plaintiff went on to explain that a new, more comprehensive textbook with which

Plaintiff had been previously unfamiliar made teaching the course more challenging. *Id.*

Plaintiff concluded that in the future she would return to using the prior textbook which, in

Plaintiff's view, "appears to have a higher performance level for Freshman". *Id.*

On March 10, 2017, the FBM held a reappointment meeting where Plaintiff's reappointment was considered.  Of the 24 permanent faculty members present, one voted for approval, nine voted for approval with reservations, and 14 voted for non-reappointment.  Dkt. No. 46 ¶ 59.  In accordance with the CBA, because a simple majority of the voting members voted for non-reappointment, the decision of the FBM was non-reappointment.  *Id*. ¶ 60. Plaintiff was not present for the March 10, 2017 reappointment meeting and does not know who was present for the meeting or how the participants voted.  *Id*. ¶ 61.

Sackin was present at the March 10, 2017 reappointment meeting, and voted for approval with reservations as to Plaintiff's reappointment, as she believed that Plaintiff should have the opportunity to improve her performance.  *Id*. ¶ 62.  Sackin believed that Plaintiff's performance was notably worse than in Plaintiff's past semesters, and continued in later semesters to be worse than her prior semesters, although Sackin does not know the reason for this trend.  *Id*. ¶ 63; Sackin Decl. ¶ 21.

At the March 10, 2017 reappointment meeting, the FBM also voted for non-reappointment of two other adjunct professors, Carolanne Romano and Benette Baer, both of whom are white women.  Dkt. No. 46 ¶ 64.

After the March 10, 2017 reappointment meeting, Professor Gross circulated a non-reappointment memorandum concerning Plaintiff's non-reappointment, which was based on Plaintiff's spring 2017 faculty observation, Plaintiff's fall 2016 student evaluations, Plaintiff's rebuttal to her fall 2016 student evaluations, and the feedback from FBM professors at the reappointment meeting.  *Id*. ¶ 65; Gross Decl., Ex. A.  The memorandum stated that Plaintiff's student evaluations were "of great concern," and noted student comments that referred to Plaintiff's "lack of effective teaching methods, lack of clarity, in delivery and grading criteria,

the need to teach themselves the material, poor time management skills, greater focus on grammar vs. content, and lack of technology . . . ." *Id*.  Professor Sackin informed Plaintiff that she was not reappointed for the fall 2017 semester during an in-person meeting.

On March 22, 2017, Plaintiff contacted Dean Frumkin to request a meeting to discuss her non-reappointment, and alleged that her non-reappointment was "crafted [by] bias and injustice." Dkt. No. 46 ¶ 68.  Plaintiff met with Frumkin on April 3, 2017 and subsequently provided Frumkin with a rebuttal to her classroom observation by Blumenthal, alleging that the observation was biased and not objective, and disputing Blumenthal's conclusions. *Id*. ¶ 69; Pierre Decl., Ex. AA.  Her rebuttal did not mention race or racial discrimination. *Id*.  On May 3, 2017, Frumkin issued a letter to Plaintiff informing her that he disagreed with FBM's non-reappointment vote and that Plaintiff should be "reappointed, observed and monitored."  Dkt. No. 46. ¶ 76; Pierre Decl. Ex. W.  Frumkin did not consult Sackin about the reappointment reversal, and Sackin did not receive a copy of Frunkin's May 3, 2017 letter to Plaintiff.  Dkt. No. 46 ¶ 77.

Following Plaintiff's re-appointment for the fall 2017, Sackin assigned Plaintiff a single section of a course that Plaintiff had not taught in the past.  Dkt. No. 46 ¶ 81.  Plaintiff believed the course sounded "wonderful" and welcomed the "new challenge." *Id*.; Pl. Dep. 162:5-163:12; 164:16-165:19.

Plaintiff received spinal fusion surgery on September 15, 2017.  As a result, Plaintiff cancelled her class on Friday, September 15, 2017 to recover. Dkt. No. 46 ¶ 90.  She then resumed an uninterrupted teaching schedule for the remainder of the semester. *Id*. ¶ 94.[1]

---

[1] The granular details of Plaintiff's injury, surgery, and return to work are immaterial because Plaintiff has withdrawn her Rehabilitation Act claim.

Sackin selected Professor Shelly Kohan ("Kohan") to conduct Plaintiff's faculty observation for the fall 2017 semester.  Dkt. No. 46 ¶ 86.  Kohan conducted Plaintiff's faculty observation on September 29, 2017.  *Id*. ¶ 98.  Kohan gave Plaintiff a rating of "unsatisfactory" for her faculty observation, and identified several deficiencies in Plaintiff's pedagogical techniques, organizational issues, and lack of preparation.  *Id*. ¶ 101.  In particular, Kohan gave Plaintiff 5 points out of 30 points for "Knowledge of the Subject," gave Plaintiff 10 points out of 20 points for "Organization of Lesson," gave Plaintiff 10 points out of 25 points for "Teaching Techniques," and gave Plaintiff 2 points out of 10 points for "Classroom Mechanics/Adherence to College Regulation."  Pierre Decl., Ex. GG.  Kohan noted that Plaintiff was told prior to the observation that she should lecture for the first half of the class, but she failed to do so for her observation.  Dkt. No. 46 ¶ 102; Pierre Decl., Ex. GG.  On October 5, 2017, Plaintiff attended a post-observation meeting with Kohan via telephone.  Dkt. No. 46 ¶ 104.

Plaintiff disagreed with Kohan's assessment and refused to sign the Faculty Observation Form.  *Id*. ¶ 103.  At her deposition, Plaintiff testified that she believed that Kohan's observation was motivated by racial discrimination, based on what Plaintiff perceived as Kohan's harsh and unfair criticism of her, as well as the "confrontational" and "[un]friendly" manner in which Kohan conducted the post-observation meeting.  *Id*. ¶ 106; Pl. Dep. 205:7-208:24; 212:3-214:20.  She further testified that in the class Kohan observed, Plaintiff was teaching the class about a successful black man, and that Plaintiff "felt that using this gentleman as an example of leadership did not resonate with [Kohan]."  Pl. Dep. 206:10-17.  Plaintiff continued, "[i]t seemed like [Kohan] had a feeling, like showing me that black men can't be successful and can't be successful leaders."  *Id*. 206:17-19.  However, Plaintiff admitted that Kohan did not say that black men could not be successful and did not use any racial slurs or racially derogatory terms.

*Id*. 206:25-207:9.  Plaintiff also objected at deposition to Kohan's note in her Faculty

Observation Form that one of the student's in Plaintiff's class had left an hour early; Plaintiff

testified that the student had previously sought permission to leave early to observe a Jewish

Holiday, and Plaintiff felt that Kohan disrespected her "as a person and a person of color" by

assuming that the student had left without permission.  *Id*. at 207:15-25.  During the post-

observation meeting, Kohan "admonish[ed]" and "ridicule[d]" Plaintiff about information

Plaintiff had lectured about that was "very accurate."  Pl. Dep. 214:9-20.  Plaintiff did not feel

that she was "treat[ed] like a colleague" or "as a person of value," and believes that it was

"[Kohan's] intention . . . to retaliate."  *Id*. 214:18-20.

On October 11, 2017, Plaintiff submitted to Sackin a rebuttal to Kohan's Faculty

Observation Form.  Dkt. No. 46 ¶ 108; Pierre Decl., Ex. HH.  On October 13, 2017, FBM held a

reappointment meeting at which Plaintiff's reappointment was considered.  Dkt. No. 46 ¶ 109.

Of 23 permanent faculty members present, none voted for approval, two voted for approval with

reservations, and 21 voted for non-reappointment.  *Id*.; Pierre Decl., Ex. II.  As with the previous

reappointment meeting, Plaintiff was not present for the October 13, 2017 reappointment

meeting and does not know who was present at the meeting or how participants voted.  *Id*. ¶ 111.

After the October 13, 2017 reappointment meeting, Gross circulated a memorandum concerning

Plaintiff's non-reappointment, which was based on Plaintiff's fall 2017 Faculty Observation

Form, Plaintiff's rebuttal to her fall 2017 semester Faculty Observation Form, Plaintiff's

available spring 2017 student evaluations, and the feedback from FBM professors during the

reappointment meeting.  *Id*. ¶ 115; Pierre Decl., Ex. JJ.  In particular, the reappointment

memorandum stated that Plaintiff had "dismissed all constructive feedback."  Pierre Decl., Ex.

JJ.  The reappointment memorandum also stated that Plaintiff only administered student

evaluations to one section of her assigned courses, and that numerous student comments reflected that they believed that the course was a "waste," despite the fact that it was a required course in the FBM program. *Id.* The reappointment memorandum further stated that "[t]he faculty are uniformly concerned that students are not getting the course content they need to move forward and that the instructor is not interested in accepting any constructive feedback to improve her effectiveness in the classroom." *Id.*; Dkt. No. 46 ¶ 116. Frumkin reviewed Plaintiff's non-reappointment memorandum and approved the department non-reappointment vote. *Id.* ¶ 118.

Following the FBM's non-reappointment vote in October 2017, Plaintiff contacted Human Resources Generalist Robert Brown to discuss her concerns regarding the reappointment process. Pl. Dep. 230:4-231:10; Pierre Decl. Ex. KK. In advance of their telephone call, Plaintiff provided Brown with additional information regarding her concerns related to the reappointment process and provided a written statement in which she alleged that she was not reappointed due to "BIASED, RACIST PEOPLE WITHIN THE FBM Department." Pierre Decl. Ex. KK. Plaintiff spoke with Brown on October 26, 2017 by telephone. *Id.*; Dkt. No. 46 ¶ 119. Immediately after Plaintiff's telephone call with Brown, Brown referred Plaintiff to Deliwe Kekana ("Kekana"), an African American woman and the Affirmative Action and Title IX Officer, to discuss her internal complaint of discrimination. Pl. Dep. 231:11-232:15, 234:2-12; Pierre Decl., Ex. LL. Plaintiff subsequently met with Kekana and Jerilee Fonseca ("Fonseca"), an Administrative Assistant, regarding her internal complaint. Plaintiff complained during the interview that Sackin, together with the T&P Committee members, were engaged in a conspiracy to remove her from FBM based on her race and purported disability. *Id.* ¶ 123; Pierre Decl., Ex. MM. Plaintiff specifically named the following professors as respondents to her internal

complaint: Sackin, Blumenthal, Gross, Kohan, Brown, Vassalotti, Sheridan, and Higden.  Dkt.
No. 46 ¶ 123; Pierre Decl., Ex. MM.

Following Plaintiff's non-reappointment vote for the fall 2017 semester, Sackin neglected
to inform Plaintiff that the FBM had voted for her non-reappointment by the December 1, 2017
deadline as required under the CBA.  Dkt. No. 46. ¶ 130.  Plaintiff was therefore reappointed for
the spring 2018 semester and was assigned one section of a single course, which she had taught
in the past.  *Id*. ¶ 131.  Brown was originally selected to conduct Plaintiff's faculty observation
for the spring 2018 semester; however, Brown elected to recuse herself because Plaintiff named
Brown in the internal complaint Plaintiff had filed in 2017.  *Id*. ¶ 132.  Janet Zeevalk was then
selected by Sackin to conduct Plaintiff's faculty observation for the spring 2018 semester.  *Id*. ¶
133.

Zeevalk performed Plaintiff's faculty observation on February 28, 2018.  Pl. Dep.
242:23-243:23; Pierre Decl., Ex. NN.  Zeevalk gave Plaintiff a rating of "Good."  Pierre Decl.,
Ex. NN.  Zeevalk gave Plaintiff 15 points out of 20 points for "Organization of Lesson."  *Id*.  She
noted that Plaintiff's use of a video during the class was "hard to follow" and that it was difficult
to understand its connection to the lesson subject.  Pierre Decl., Ex. NN.  She recommended that
Plaintiff review the material "before the video and then watch[] the video without the stops and
starts . . . for a more organized delivery."  *Id*.  Plaintiff attended a post-observation meeting with
Zeevalk.  Plaintiff testified to her belief that Zeevalk's Faculty Observation Form was motivated
by racial discrimination, on the grounds that Zeevalk did not have a clear understanding of the
course material but leveled unfair and insulting criticisms of Plaintiff.  Pl. Dep. 244:4-25.  In
particular, Plaintiff stated that Zeevalk inaccurately criticized Plaintiff for having her
presentation slides out of order, which Plaintiff interpreted to be tinged with racial bias.  Plaintiff

stated: "As far as being racist, when people want to minimize people of color they pick the most minute thing and say oh, well, you didn't have [the slides] in order; they didn't appear to be in order to me . . . That's ridiculously racially motivated." *Id*. at 246:5-11.  Plaintiff felt that Zeevalk spoke to her in a condescending manner and stated, "[t]he mere fact that a person doesn't speak to you like an equal is, as far as I'm concerned, racial discrimination."  *Id*. at 246:15-17.

Plaintiff did not discuss her October 26, 2017 internal complaint with Zeevalk and did not name Zeevalk in her October 26, 2017 internal complaint.  Dkt. No. 46 ¶ 140.  On February 28, 2018, Plaintiff submitted to Sackin a rebuttal to Zeevalk's observation.  Plaintiff stated her belief that her observation was part of an "unrelenting pattern of attacks" against her as well as "discrimination and blatant racism directed by some members of the FBM," whom Plaintiff identified as Sackin and the T&P Committee.  *Id*. ¶ 141; Pierre Decl., Ex. OO.

On March 9, 2018, the FBM held a reappointment meeting to consider the reappointment of adjunct professors.  At this reappointment meeting, the FBM voted to not reappoint Ronit Weinberg, a white woman.  Dkt. No. 46 ¶ 142.  On March 20, 2018, the FBM held a second reappointment meeting to consider the reappointment of remaining adjunct professors, including Plaintiff.  Of the 20 permanent faculty members present, nobody voted for reappointment, three voted for reappointment with reservations, 16 voted for non-reappointment, and one abstained. *Id*. ¶ 143.  Plaintiff was not present for either reappointment meeting, although she was invited to attend the March 20, 2018 reappointment in person as well as by telephone.  At Plaintiff's request, a union representative was also present at the March 20, 2018 reappointment meeting. *Id*. ¶ 144.  Plaintiff's October 26, 2017 internal complaint was not discussed at the March 20, 2018 reappointment meeting.  *Id*. ¶ 146.

After the March 20, 2018 reappointment meeting, Gross circulated a memorandum concerning Plaintiff's non-reappointment.  The memorandum referenced Plaintiff's spring 2018 semester Faculty Observation Form, Plaintiff's rebuttal to her spring semester Faculty Observation Form, and past student evaluations and faculty observations.  *Id.* ¶ 149.  In particular, the memorandum stated that Plaintiff's faculty observation highlighted issues "that are common for a new instructor rather than an instructor who has accrued 36 hours" or previously taught in the past.  Pierre Decl., Ex QQ.  The reappointment memorandum also stated that Plaintiff attacked her observer and the reappointment process and "[a]t no time . . . accept[ed] any of the constructive feedback or recommendations from the observer[s] . . . This shows a disregard for a student-centered approach to the teaching process."  *Id.*  The reappointment memorandum stated that Plaintiff used course material presented during her observation from another course, FM-361, and not FM-268, her assigned course.  *Id.*  The reappointment memorandum also quoted Plaintiff's rebuttal, including her accusation of "discriminatory and blatant racism."  *Id.*; *see* Dkt. No. 46 ¶ 150.  The non-reappointment memorandum concluded by stating, "[t]he faculty are uniformly concerned that students are not getting the course content they need to move forward and that the instructor shows complete disregard for accepting any constructive feedback to improve her effectiveness in the classroom.  She shows a lack of respect for the process set forth in the CBA and for her colleagues.  If we as faculty are responsible for setting the bar for civility, [Plaintiff] fails to contribute to the dialogue."  Pierre Decl., Ex. QQ.  The memorandum was dated March 20, 2018 and provided to the college-wide T&P Committee Chair.  *Id.*  Professor Sakin informed Plaintiff that she was not appointed for the fall 2018 semester by email on April 5, 2018 and that Frumkin agreed with the FBM's determination.  Dkt. No. 46 ¶ 152.

## PROCEDURAL HISTORY

Plaintiff filed a Charge of Discrimination with the Equal Opportunity Commission on June 8, 2018.  Dkt. No. 25 ¶ 4.  On or about October 1, 2018, she received a Notice of Right to Sue from the EEOC.  *Id*. ¶ 5.  Plaintiff filed her first complaint in the instant matter on December 28, 2018, which she amended on August 2, 2019.  Defendant filed the instant motion on May 1, 2020, with an opposition filed on June 2, 2020 and a reply filed on June 23, 2020.  *See* Dkt. Nos. 38, 45, 48.  On November 12, 2020 the Court heard oral argument on the motion.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party." *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

Rather, to survive a summary judgment motion, the opposing party must establish a genuine

issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P.

56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). To defeat a motion for

summary judgment, the non-moving party must demonstrate more than "some metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations

in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the

motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal

citation omitted). In cases involving claims of discrimination or retaliation, "an extra measure of

caution is merited in affirming summary judgment . . . because direct evidence of discriminatory

intent is rare and such intent must often be inferred from circumstantial evidence found in

affidavits and depositions." *Chiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir.

2006) (quoting *Holtz v. Rockerfeller & Co., Inc.*, 258 F.3d 62, 69 (2d. Cir. 2001)) (internal

citation omitted). However, "the salutary purposes of summary judgment—avoiding protracted,

expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of

litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting

*Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). "[T]rial courts should not 'treat

discrimination differently from other ultimate questions of fact,'" *id*. (quoting *Reeves v.

Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)), and even in the discrimination

context, "a plaintiff must provide more than conclusory allegations to resist a motion for

summary judgment," *Holcomb*, 521 F.3d at 137.

The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1(a). Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1(b). All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible." L.R. 56.1(d). "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L.R. 56.1(c).

## DISCUSSION

### A.    Plaintiff's Deficient Rule 56.1 Counterstatement

As an initial matter, Plaintiff's counter-56.1 statement largely does not contain meaningful responses or additions to Defendant's 56.1 statement. Rather, in response to nearly every paragraph of Defendant's 56.1 statement, Plaintiff merely recites identical conclusory and boilerplate objections that Defendant's factual statements violate Federal Rule of Civil Procedure 56(c) and Local Civil Rule 56.1(a). Thus, "[p]ursuant to Local Civil Rule 56.1 Defendant's statements are deemed to be admitted where Plaintiff has failed to specifically controvert them with citations to the record." *Knight v. New York City Hous. Auth.*, 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007); *see, e.g. Colton v. New York Div. of State Police*, at *2 (N.D.N.Y. Feb.

17

8, 2017) (same); N.*Y. Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying [Northern District of New York's analogue to L.R. 56.1] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive . . . statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations").

The outcome of this case does not turn, however, solely on Plaintiff's failure to comply with the technical requirements of Local Rule 56.1.  A review of the entire summary judgment record demonstrates that she has failed to present evidence demonstrating a genuine issue of material fact.

**B.      Plaintiff Has Failed To Present Evidence Establishing a Prima Facie Case of Discrimination**

Claims of adverse employment action discrimination under Title VII are governed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this standard, Plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination.  *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010) (citation omitted).  If a plaintiff meets this initial burden, "the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for the termination.  If the defendant does so, the burden returns to the plaintiff to show that the real reason for plaintiff's termination was his race . . ." *Id.*

In employment discrimination cases, the burden of establishing a prima facia case is "minimal."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Lenzi v.*

*Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).  However, a plaintiff cannot establish a prima facie case based on "purely conclusory allegations of discrimination, absent any concrete particulars."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829 (1985).

The parties do not dispute the first three elements necessary to establish a prima facie case for race discrimination under the *McDonnell Douglass* framework; at issue is the fourth element, whether Plaintiff's non-reappointment took place under circumstances giving rise to an inference of discrimination.  It did not.

An inference of discrimination can be proven with direct or indirect evidence.  *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991).  Such evidence may take a "variety" of forms, including "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."  *Espinoza v. N.Y.C. Dep't of Transp.*, 304 F. Supp. 3d 374, 389 (S.D.N.Y. 2018) (quoting *Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015) (internal quotation marks omitted).

In this case, however, there is no evidence to give rise to such an inference.  Plaintiff does not allege that any faculty member involved in her peer observations, nor indeed any faculty member who voted on her non-reappointment, made any criticism in ethically degrading terms or invidious comments about African-Americans.  Nor does Plaintiff adduce any evidence suggesting that she was treated differently than individuals of any other race.  *See Lopez v. Guardian Serv. Indus. Inc.*, 2012 WL 463958, at *5 (S.D.N.Y. Feb. 10, 2012) (granting summary judgment where "[the plaintiff] ha[d] not provided the Court with any facts from which one

could infer . . . animus, nor ha[d the plaintiff] pointed to any other specific actions or comments from which one could infer . . . animus").

Rather, Plaintiff's grievances are rooted in the allegation that in her post-observation meetings she was, in essence, harshly criticized by her various observers in a manner that was condescending, rude, and unfounded. *See supra.* Plaintiff further argues that although Sackin never made any racially demeaning comments to her or in her presence, she knew Sackin to harbor racial animus because she had observed other African-American employees treated unfavorably in the promotions and reappointment context. These theories, which are not backed by concrete evidence, are insufficient to create a genuine issue of material fact.

Plaintiff's beliefs, without more, that the harsh tone and manner of the criticism she received was in the product of racial bias is insufficient to create an inference of discrimination. *See Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 379 (E.D.N.Y. 2013) ("A plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn.") (citation omitted); *Gross v. Nat'l Broad. Co., Inc.*, 232 F. Supp. 2d 58, 72 (S.D.N.Y. 2002) ("[Plaintiff's] conclusory statements and subjective feelings—not facts—in support of her claims that she was treated differently because of her gender . . . cannot withstand a properly supported motion for summary judgment."). Neither do Plaintiff's beliefs that the substance of the criticisms was unfounded create such an inference. *Sotomayor v. City of N.Y.*, 862 F. Supp. 2d 226, 259 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013) ("plaintiff's subjective disagreement with [his performance] reviews is not a viable basis for a discrimination claim.") (quoting *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999)). The Second Circuit has held in particular that "universities are free to establish departmental

priorities . . . and to act upon the good faith judgments of their departmental faculties or reviewing authorities." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 73 (2d Cir. 2015) (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 94 (2d Cir.1984).  More broadly, "Title VII is not an invitation for courts to 'sit as a super-personnel department that reexamines' employers' judgments." *Id.* (quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir.2014) (per curiam) (quoting *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir.1997)).  An employer can subject an employee to harsh and—in the minds of the recipient—unfounded criticism without subjecting itself to a discrimination lawsuit.

Plaintiff's allegations about Sackin are equally lacking in fact and evidence.  Plaintiff testified at deposition that she believed Sackin to be racist because Sackin was involved in and "influenc[ed]" the non-promotion of four African-American professors whom Plaintiff alleges were more credentialed than white employees that were promoted instead.  Dkt. No. 46 ¶ 71; Pl. Dep. 119:12-25; 123:19-124:2; 149:10-152:25.  However, Plaintiff did not back that testimony with any evidence as to Sackin's vote on the four professors or his involvement in the discussion of them and she admitted that she did not review the observations or student evaluations for these candidates or for candidates who were promoted to know whether the employees who were promoted were more or less qualified.  *See* Pl. Dep. 119:12-128:8; 149:10-152:25.  Sackin was one of many permanent FMB faculty members, and he was occasionally in the minority in reappointment votes, including on votes about Plaintiff.  In the absence of any evidence of Sackin's comments or involvement or the respective qualifications of the candidates, Plaintiff is left with the bare, and insufficient, claim that because Sackin was the FMB Chair and because four African-American professors were not promoted, Sackin must have been racist.

Plaintiff argues that an inference of discrimination can be drawn from the fact that the written notes and notes of comments made by members of the T&P Committee at Plaintiff's reappointment meetings were destroyed at the end of each semester.  Plaintiff argues that "at the very least, FIT was required to preserve[] all document[s] pertaining to Stewart's claim of discrimination on receipt of notice showing that she will be taking legal action."  Dkt. No. 45 at 9.  This argument is not supported by the evidence.  The CBA requires only that a written statement of the reasons for the vote be provided, not that notes taken by T&P Committee members be kept.  *See* Pierre Decl., Ex. F.  Such a statement was in fact provided.  *See* Pierre Decl., Ex. QQ.  The only evidence Plaintiff relies on to establish that notes were both taken and destroyed is testimony by Sackin and Gross that the T&P Committee had a *general practice* of discarding the notes taken by committee members at the end of each semester.  *See* Wade Decl., Ex. 4 at 19:24-21:13; Wade Decl., Ex. 6 at 16:3-20:12.  This evidence does not address when, or even whether, the notes from Plaintiff's reappointment—to the extent there were any—were destroyed.  Even drawing the inference that they *were* destroyed, the evidence Plaintiff relies on merely shows that a normal procedure was followed—not that there was any procedural irregularity that suggests bias in FIT's treatment of Plaintiff.  *Cf.  Weinstock v. Columbia Univ.*, 224 F.3d 33, 45 (2d Cir. 2000) ("[d]epartures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the decision.") (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir.1997)).  To the extent that FIT might have had an obligation to *deviate* from its normal procedure and preserve the comments made at Plaintiff's reappointment hearings as a result of receiving notice that Plaintiff would be taking legal action, *see Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) ("an obligation to preserve evidence arises when the party has notice that the evidence is

relevant to litigation or when a party should have known that the evidence may be relevant to future litigation"), there is no evidence that FIT had such notice at the relevant time.  FIT received notice that Plaintiff had filed an EEOC Charge of Discrimination on June 18, 2018.  *See* Kekana Supp. Decl. ¶¶ 2-3, Ex A.  Plaintiff's final reappointment hearing was on March 20, 2018.  There is no evidence that comments from that hearing were discarded after June 18, 2018—if they were discarded at all.  In sum, no inference of discrimination can be drawn from the unremarkable testimony of Sackin and Gross that FIT has a general practice to discard written notes and comments recorded at reappointment meetings at the end of each semester.

Conversely, there is an abundance of circumstantial evidence that undercuts an inference of discrimination.  First, Sackin, whom Plaintiff claims was instrumental to her non-reappointment, and whom Plaintiff argues harbored racial animus, was also the person that re-hired Plaintiff when she returned to teaching in 2013.  *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her [or him] an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring."); *Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 319 (E.D.N.Y. 2014) ("Although the Second Circuit has not delineated a set time period after which the same actor inference does not apply, it has applied the same actor inference to a plaintiff that was 'fired by the same man who had hired him three years earlier.") (quoting *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir.2000)) (internal quotation omitted); *cf. Carlton v. Mystic Transp., Inc*., 202 F.3d 129, 138 (2d Cir.2000) (finding seven years between hiring and termination significantly weakens the inference).

Second, in the spring 2017 semester, the first semester in which a majority of permanent faculty members (14 out of 24) voted for Plaintiff's non-reappointment, Sackin voted for approval with reservations of Plaintiff's reappointment.  Dkt. No. 46 ¶ 62.

Third, in the March 2017 and March 2018 reappointment meetings, at least three white adjunct professors were also not reappointed based on the same vote of the FBM faculty.  Dkt. No. 46 ¶¶ 64, 142.  Plaintiff has adduced no evidence that her performance was superior to those adjunct faculty members, or equal to adjunct faculty members who were not subjected to non-reappointment.  *Cf. Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("A plaintiff may raise [an inference of discrimination] by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group.").

Fourth, Plaintiff's non-reappointment was not decided by Sackin or any of Plaintiff's peer reviewers alone.  It was decided by a vote of 20 FBM permanent faculty members, none of whom voted for approval of Plaintiff's reappointment, three of whom voted for approval with reservations, and sixteen of whom voted for non-reappointment (with one abstention).  The voting faculty included Brown, an African-American employee who voted for non-reappointment.  *See Eder v. City of N.Y.*, 2009 WL 362706, at *8 (S.D.N.Y. Feb. 12, 2009) (inference of discrimination is undermined where decisionmaker and Plaintiff are members of the same protected class); *Tucker v. N.Y. City*, 2008 WL 4450271, at *5 (S.D.N.Y. Sept. 30, 2008), aff'd, 376 F. App'x 100 (2d Cir. 2010) (same).

In sum, Plaintiff has clearly not met the burden to establish a prima facie case for discrimination.  There is an absence of evidence that any actor involved in Plaintiff's non-reappointment was motivated by racial bias, and the circumstances and nature of the procedure

that led to her non-reappointment only cut against such an inference.  For that reason alone, her

claim must be dismissed.

C.     **Any Inference of Discrimination is Rebutted by Legitimate Non-Pretextual Reasons for Plaintiff's Non-Reappointment**

Even if Plaintiff had made a prima facie case, the evidence shows that there were

legitimate, non-pretextual reasons for Plaintiff's non-reappointment.  The T&P Committee voted

three consecutive times not to reappoint Plaintiff.  The votes were based upon Plaintiff's student

evaluations from the prior semester, faculty observations, plaintiff's rebuttal statements, and

feedback from the T&P Committee members.  Importantly, all three memoranda of non-

reappointment prepared by the T&P Committee contained consistent statements that peer

observers had noted Plaintiff's pedagogical and organizational challenges.  *Compare* Gross

Decl., Ex. A *and* Pierre Decl., Ex. JJ, *with* Pierre Decl., Ex. QQ.  These challenges included that

there was a lack of clarity about the topics that would be addressed in the classes, that the

materials were presented in an unorganized and confusing manner, and that Plaintiff had

technological issues.  The memorandum of non-reappointment prepared in March 2018, which

summarized the reasons for the vote that ultimately resulted in Plaintiff's non-reappointment,

noted that the faculty observer found that the topic Plaintiff was teaching was unclear, that

certain PowerPoint slides were not in the correct order, and that the Plaintiff did not elicit student

responses in an effort to spur critical thinking about the material.  Pierre Decl., Ex. QQ.  The

memorandum concluded that "[t]hese are issues that are common for a new instructor rather than

an instructor who has accrued 36 hours."  *Id*.  The memorandum observes that Plaintiff received

an "extremely high" overall student evaluation score of 5.91 out of 6 in the semester prior to her

non-reappointment, but it also noted a significantly lower score of 4.78 out of 6 in the fall 2016

semester.  The memorandum concludes by noting a "uniform[] concern[]" among the faculty

"that the instructor shows complete disregard for accepting any constructive feedback to improve her effectiveness in the classroom." *Id*.  It continued, "[s]he shows lack of respect for the process set forth in the CBA and for her colleagues.  If we, as faculty, are responsible for setting the bar for civility, Professor Stewart fails to contribute to the dialogue." *Id*.

To establish pretext, Plaintiff must show that FIT's proffered reason was "false and that discrimination was the real reason." *Gladwin v. Pozzi*, 2010 WL 245575, at *9 (S.D.N.Y.), *aff'd*, 403 F. App'x 603 (2d Cir. 2010).  However, "[p]retext cannot be shown through mere speculation or bare conclusory allegations." *Baguer v. Spanish Broad. Sys., Inc.*, 2010 WL 2813632, at *10 (S.D.N.Y. 2010), *aff'd*, 423 F. App'x 102 (2d Cir. 2011).  There is no evidence of pretext on the record.  Although Plaintiff repeatedly expressed disagreement with the assessments of the quality of her work, "[t]he mere fact that an employee disagrees with her employer's assessment of her work . . . cannot standing on its own show that her employer's asserted reason for termination was pretextual." *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) (quoting *Ricks v. Conde Naste Pub., Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000); *see also Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) ("An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action.").  The consistency of the peer reviews and memoranda evaluating Plaintiff cut against a finding of pretext, *cf. Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) ("[I]nconsistent and contradictory explanations for the plaintiff's termination . . ." can create an genuine issue of material fact as to whether proffered reasons are pretextual), as does all of circumstantial evidence cited in the preceding section as to the absence of evidence of discrimination.  Simply put, there is no evidence of pretext.

**D.      There is No Genuine Issue of Material Fact That Plaintiff Was Retaliated Against**

Defendant also is entitled to summary judgment on Plaintiff's retaliation claim.[2]

Retaliation claims are "also measured under the three-step McDonnell Douglass analysis."

*Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (citation omitted). Thus, to

state a prima facie case for retaliation under Title VII, NYSHRL, or Section 1983, a plaintiff

must show "(1) participation in a protected activity; (2) that the defendant knew of the protected

activity; (3) an adverse employment action; and (4) a causal connection between the protected

activity and the adverse employment action." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112 (2d Cir.

2019). "Once a prima facie case of retaliation is established, the burden of production shifts to

the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action."

*Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir.2001). If the employer carries that burden, then

the burden shifts back to the plaintiff to prove "that the desire to retaliate was the but-for cause of

the challenged employment action." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d

Cir. 2015) (citations omitted). Although "but-for" causation does not require a showing that

retaliation was an employer's sole motive, showing that retaliation was "simply a 'substantial' or

'motivating' factor in the employer's decision" is insufficient to prove a retaliation claim. *Zann*

*Kwan*, 737 F.3d at 845 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013)).

---

[2] Defendant argues that Plaintiff abandoned the retaliation claim by not responding to Defendant's arguments in her opposition brief. The Court declines to rule the claim abandoned. In a counselled case, "a partial opposition may imply an abandonment of some claims or defenses. Generally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others." *Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014). Thus, "in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Id.* at 198. In this case, however, Plaintiff explicitly abandoned her rehabilitation claim in her opposition but not the retaliation claim, leaving the negative implication that she was preserving her retaliation claim. In addition, Plaintiff argued her retaliation claim at oral argument. The Court therefore does not infer that the retaliation claim is abandoned. Nevertheless, there is no genuine issue of material fact and the retaliation claim must be dismissed as a matter of law.

Plaintiff easily satisfies the first three elements of a prima facie case for retaliation.  As to the first element, protected activity "refers to action taken to protest or oppose statutorily prohibited discrimination."  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (internal quotation marks omitted), *superseded by regulation on other grounds as stated in Natofsky v. City of N.Y.*, 921 F.3d 337, 354 (2d Cir. 2019).  "Such activity can be either formal, such as the filing of formal discrimination charges, or informal, such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges.'"  *Kim A. Champion v. N.Y. State Off. of Parks, Recreation, and Hist. Pres.*, 2020 WL 6487638, at *18 (S.D.N.Y. Nov. 4, 2020) (quoting *Matima v. Celli*, 228 F.3d 68, 78–79 (2d Cir. 2000) (internal quotations omitted)).

In October 2017, following the FBM's second vote for Plaintiff's non-reappointment, Plaintiff initiated a formal complaint alleging race discrimination within FBM.  *See supra*. Plaintiff also complained of racial bias in her rebuttal to Zeevalk's observation of her in spring 2018.[3]  In her rebuttal, Plaintiff stated her belief that her observation was part of an "unrelenting pattern of attacks" against her and "discriminatory and blatant racism directed by some members of the FBM."  Dkt. No. 46 ¶ 141.  Pierre Decl., Ex. OO.  These complaints satisfy the prima facie retaliation standard for protected activity.

---

[3] Defendant contended at oral argument that Plaintiff's rebuttal, which was read aloud at her reappointment meeting, does not constitute protected activity because Plaintiff's preparation of a rebuttal is contemplated—and the T&P Committee's reading of it is required—by the CBA.  The parties do not dispute that as a matter of practice, "[d]uring the Reappointment Meeting, a candidate's rebuttal to their peer observation is read to committee."  Dkt. No. 49 ¶ 162.  However, Plaintiff's spring 2018 rebuttal, which contained an allegation of racial bias, is a "complaint to management" of racial bias, and therefore does constitute protected activity.  *Matima*, 228 F.3d at 78.  That said, Defendant is correct that the fact that the rebuttal was read by the T&P Committee at the reappointment hearing is insufficient to create an inference of discrimination or to create an issue of fact that retaliation was the but-for cause for Plaintiff's non-reappointment, as discussed further *infra*.

Defendant does not dispute that the second and third elements of a prima facie case for retaliation are satisfied.  The fourth element, a causal connection, can be demonstrated either "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant," or "indirectly, by showing that the protected activity was followed closely by the discriminatory treatment."  *Hicks*, 593 F.3d at 170 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  Establishing a temporal proximity between a protected activity and adverse employment action is sufficient for prima facie causation.  *See Zann Kwan*, 737 F.3d at 845.  Such a temporal proximity exists here.  Just over four months separated Plaintiff's formal complaint to HR and her non-reappointment in spring 2018.  Although the question is close, the Court deems this alone to be sufficient to create a prima facie case of retaliation.  *See, e.g.*, *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (five-month gap is not necessarily too long for temporal proximity).  Moreover, Plaintiff's rebuttal to her peer spring 2018 observation which was read at Plaintiff's non-reappointment hearing is sufficiently proximate to her non-reappointment the following month to establish prima facie causality.

However, while temporal proximity alone can support a causal connection at the prima facie stage, it is "insufficient to defeat summary judgment at the pretext stage." *Zann Kwan*, 737 F.3d at 847.  Plaintiff's spring 2018 rebuttal was required to be read by FBM policy and the CBA and followed (and did not precede) the negative evaluations upon which the FBM based its decision.  *See* Dkt. No. 49 ¶ 162.  At oral argument, although Plaintiff maintained that the rebuttal constituted protected activity, she admitted that a statement required to be read in response to criticism of her at the meeting where the FBM voted for non-approval could not alone establish both protected activity and causation sufficient to give rise to a triable fact.  Were it otherwise, a Plaintiff facing potential demotion or non-approval could always

manufacture a retaliation claim by, in response to criticism, crafting a response that the criticism was the product of racial bias and then demanding the response be read to the deciding committee.  As with Plaintiff's claim for race discrimination under Title VII, there is a dearth of evidence, direct or circumstantial, that Plaintiff's complaints caused any member of the T&P Committee to vote for her non-reappointment.  Therefore, there is no genuine issue of material fact that Plaintiff was retaliated against.  In addition to the abundance of evidence described above that the proffered legitimate reasons for Plaintiff's non-reappointment were genuine, it is also salient that the T&P Committee twice voted not to reappoint Plaintiff *before* she complained to anyone of discrimination.  Combined with the absence of evidence, this fact erases any doubt that retaliation for Plaintiff's complaints was the but-for cause of Plaintiff's termination. Plaintiff's claim for retaliation must be dismissed.

## CONCLUSION

For the reasons stated, Defendant is entitled to summary judgment on all counts, and the Complaint is dismissed.  The Clerk of Court is respectfully directed to enter judgment for Defendant and close the case.

SO ORDERED.

Dated: November 16, 2020
       New York, New York                    _____
                                                      LEWIS J. LIMAN
                                             United States District Judge